# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7790 | **DATE** | 11/12/2004 |
| **CASE TITLE** | Lopez vs. Bd Trustees University of IL | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The Court grants Defendants' Motion for Summary Judgment on all three counts. Status hearing set for 11/22/04 is stricken. Any other pending dates are stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | NOV 15 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TH ✓ | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JUAN LOPEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | 02 C 7790 |
| BOARD OF TRUSTEES OF THE UNIVERSITY | ) | |
| OF ILLINOIS AT CHICAGO, LYN RAGSDALE, | ) | |
| LAWRENCE POSTON, STANLEY FISH, | ) | |
| CHARLOTTE A. TATE, CLARK HULSE, | ) | |
| SYLVIA MANNING, JOHN DOES, | ) | |
| and JANE DOES, | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED
NOV 1 5 2004

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Juan Lopez ("Lopez") brought this action against the Board of Trustees of the University of Illinois at Chicago ("UIC" or "the University"), along with named and unnamed individuals employed by the University ("individual defendants").[1] In his Second Amended Complaint, Professor Lopez alleges that UIC discriminated against him based on his national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Professor Lopez also alleges that the individual defendants retaliated against him in violation of the First Amendment and denied him his right to procedural due process under the Fourteenth Amendment. *See* 42 U.S.C. § 1983. The University and individual defendants have moved for summary judgment on all three counts. For the following reasons, Defendants' motion is granted.

---

[1] The Court previously dismissed Lawrence Poston from this action.

# I.    SUMMARY JUDGMENT STANDARDS

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The existence of a factual dispute is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the summary judgment motion. *See Vukadinovich v. Board of Sch. Trs.,* 278 F.3d 693, 699 (7th Cir. 2002) (quotation and citation omitted). The Court considers the evidence in a light most favorable to the non-moving party and draws all reasonable inferences in his favor. *See Anderson,* 477 U.S. at 255; *Williamson v. Indiana Univ.,* 345 F.3d 459, 462 (7th Cir. 2003).

# II.    UNDISPUTED FACTS

## A.    Parties

### 1.    Professor Juan Lopez

Dr. Juan Lopez is a Cuban exile who left Cuba when he was 13 years-old and settled in the Chicago area. (R. 60-1, Pl.'s Statement of Add'l Facts, ¶ 1.) In 1978, Professor Lopez graduated from the University of Chicago with a Bachelor of Arts degree in Political Science. Professor Lopez also has a Masters and Ph.D. in Political Science from the University of

Chicago. (Pl.'s Stmt. ¶ 1.) In 1995, UIC hired Professor Lopez as an assistant professor with a 75 percent appointment to the Political Science Department and a 25 percent appointment to the Latin American and Latino Studies ("LALS") Program. (*Id.* at ¶ 2.) Professor Lopez's specialty is comparative politics with an emphasis on Latin American and Cuba. (*Id.* at ¶ 5.) At the time the University hired Professor Lopez, the Political Science Department was actively seeking to hire new Hispanic and African American faculty members and ultimately hired two new Hispanic faculty members, including Professor Lopez, and a new African American faculty member. (*Id.* at ¶ 3.)

**2.      University of Illinois at Chicago**

The University is an accredited public research university with a total enrollment of 26,000 undergraduate, graduate, and professional students. (R. 50-1, Def.'s Rule 56.1 Statement of Material Facts ¶¶ 2, 3.) The University employs approximately 1,300 faculty members who are tenured or working toward tenure. (Def.'s Stmt. ¶ 4.) The University requires that full-time faculty must attain tenure within a proscribed period. (*Id.* at ¶ 6.) The University employs tenured track faculty members on a probationary basis of a year-to-year contract. (*Id.* at ¶ 8.) A faculty member on the tenure track must submit his materials for tenure consideration no later than his sixth year of probation. (*Id.* at ¶ 9.)

The tenure process is a complex, ruled-governed system controlled by the University's Promotion and Tenure Policies and Procedures. (Pl.'s Stmt. ¶ 6.) According to the Promotion and Tenure Policies and Procedures for 2001-02, administrators and fully tenured faculty members on the candidate's committee evaluate tenure candidates on both achievement and the promise of future achievement in the areas of research, teaching, and service. (Pl.'s Stmt. ¶ 6; R.

3

60-1, Pl.'s Rule 56.1 Resp. ¶ 7, R. 51-1, Def.'s Combined Materials Vol. I, Tab 7, Hulse, Decl.,

Tab A, at U00013, U00027-29.) The tenure process includes mid-probation evaluations,

including a third year review, which describes a faculty members' progress toward tenure at the

third year of what is usually a six or seven year process. (Pl.'s Stmt. ¶ 7.) Before the final tenure

process, the University submits tenure application files to external reviewers at other research

universities for their evaluation. (*Id.* at ¶ 12.) After receiving the external reviews and prior to

the final tenure evaluation, a working committee evaluates the candidate's progress toward

achieving tenure. (Def.'s Stmt. ¶ 50.) Next, the departmental tenure committee reviews the

applicant's tenure packet and then votes on whether the applicant should receive tenure. (*Id.* at ¶

84.) The committee's vote is advisory to the department chair, who makes the final decision on

behalf of the candidate's particular department. (*Id.* at ¶ 88.) The Executive Committee of the

College of Liberal Arts and Sciences then reviews the applicant's tenure case. (*Id.* at ¶ 105.)

Finally, the Campus Promotion and Tenure Committee reviews a candidate's tenure application

and makes the final determination. (*Id.* at ¶ 113.) If the candidate receives a negative decision

on his tenure bid, he may file an appeal with the Vice Chancellor for Academic Affairs. (*Id.* at ¶

124.)

### B.  Professor Lopez's Promotion and Tenure Review Process

#### 1.  Mid-Probation Evaluations

Rasma Karklins, who at the time was the Chair of the Political Science Department, was

on Professor Lopez's third year review committee and selected the other members of the

committee, including another specialist in comparative politics, Professor B.C. Koh, and

Professor Dick Johnson, a non-comparativist. (Pl.'s Stmt. ¶ 9.) In 1998, the third year review

4

committee gave Professor Lopez a positive review. (Pl.'s Stmt. ¶ 8; R. 61-1, Pl.'s Combined Materials Vol. I, Karklins Dep., Tab11, Ex. 8, at U00145-151.) The committee characterized Professor Lopez as "an excellent scholar" who had published several important articles and noted that "the quality of his publications is very high." (*Id.*) The committee also noted that Professor Lopez is an "extremely dedicated teacher whose performance is clearly above the norm" and that he "has carried a heavier service load than one often finds among junior faculty members." (*Id.*; Karklins Dep., Tab 11, Ex. 8 at U000150.) The committee concluded that Professor Lopez "is making good progress towards promotion" and "should be a strong candidate for tenure *if* his book is accepted for publication in due course." (*Id.*; Pl.'s Tab 11, Karklins Dep., Ex. 8 at U000151) (emphasis in original).

A committee representing the LALS Program also prepared a third year review of Professor Lopez's progress toward tenure. (Def.'s Stmt. ¶ 38.) On a general level, the LALS committee concurred with the Political Science committee that Professor Lopez had made sufficient progress to pass his third year review. (Def.'s Stmt. ¶ 42; Def.'s Tab 1, Aparicio Dep., Ex. 9 at U00498.) As to Professor Lopez's research, the LALS committee was concerned with his theory and methodology. (*Id.*) The committee noted: "Prof. Lopez has studied with some of the leading students of democratic transition in international and Latin American contexts. He knows much. Yet, the application of the theories he has studied may require further nuancing and self-critical reformulation." (Def.'s Tab 1, Aparicio Dep., Ex. 9 at U00499.) The LALS committee also commented that Professor Lopez's teaching ratings were very positive and concluded that Professor Lopez's service was satisfactory for a junior professor on a 25 percent appointment. (*Id.*)

In March of 2000, Professor Lopez' fifth year review committee, comprised of Professors Karklins and Koh, issued a report to the Political Science Department's tenured faculty regarding Professor Lopez's progress toward tenure. (Def.'s Stmt. ¶ 45; Def.'s Tab 10, Karklins Dep., Ex. 8 at U00160.) In the report, the committee stated that Professor Lopez was making steady and good progress toward tenure and that he was working on three book projects. (Def.'s Tab 10, Karklins Dep., Ex. 8 at U000160.) One book involved the United States' policy toward Cuba, another evolved from his Ph.D. thesis on Argentina, and the third, a co-authored piece, addressed transitions and non-transitions from communism in Eastern Europe, Latin America, and Cuba. (*Id.*) The committee also noted that Professor Lopez had received UIC's Teaching Recognition Program Award and that he was very active in departmental meetings and student lectures. (*Id.*) The fifth year report concluded: "[T]he review committee urges Juan to focus on having at least one of his books in print or accepted for publication by the time his tenure materials have to be sent out for review in early summer 2001." (*Id.*)

## 2.   Professor Lopez's Publications

Professor Lopez decided not to publish his book on Argentina entitled, *Economic Performance: Argentina a Comparative Perspective,* which related to the importance of political institutions for economic development and success. (Def.'s Stmt. ¶ 45; Def.'s Tab 10, Karklins Dep., Ex. 8 at U00147.) Professor Lopez's Argentina research was broadly based on his doctoral dissertation at the University of Chicago. (Karklins Dep., Ex. 8 at U00147.) Instead, Professor Lopez wanted to publish a book on the Cuban embargo given the focus at the time on why the Castro government had enduring power when communism had fallen in Eastern Europe. (Def.'s Stmt. ¶ 45.) Professor Lopez finalized his manuscript on Cuba, ultimately entitled

6

*Democracy Delayed: The Case of Castro's Cuba,* prior to the final disposition of his request for tenure, but Professor Lopez did not have it ready for transmittal to publishers until the spring of 2001. *(Id.* at ¶ 53.) Professor Lopez's book followed the model of Juan Linz and Alfred Stepan, which examined the historic development of totalitarian regimes. *(Id.* at ¶ 54.) Although the Linz/Stepan model was normally used to examine past events, Professor Lopez went further and used the model in an attempt to predict the best way to bring democracy to Cuba. *(Id.* at ¶ 55.) Professor Lopez concluded that a necessary means to bring democracy to Cuba was to tighten the United States' embargo on Cuba and significantly increase the United States' funding of Radio Marti, a radio station similar to Radio Free Europe, designed to bring outside information to Cuba. *(Id.)*

Initially, the University of Pennsylvania Press indicated that it planned on publishing Professor Lopez's book. (Pl.'s Stmt. ¶ 18.) At the last minute, however, the University of Pennsylvania Press decided not to publish the book because it chose not to publish anything additional in the area of political science. *(Id.)* Ultimately, John Hopkins University Press, a highly respected academic press, accepted Professor Lopez's book for publication in early September of 2001. *(Id.* at ¶ 20.) Both Transaction Press and Lexington Press, also well-regarded publishers, offered to publish Professor Lopez's book, but Professor Lopez chose John Hopkins University Press because it was more prestigious. (Def.'s Stmt. ¶ 59.)

### 3. External Reviews of Tenure File

Next, five external reviewers analyzed Professor Lopez's tenure file, which included a partial manuscript of *Democracy Delayed: The Case of Castro's Cuba. (Id.* at ¶ 63.) In a June 22, 2001, letter to the external reviewers, Professor Karklins requested that they evaluate the

quality of Professor Lopez's work and its standing in a national context. (Pl.'s Tab 11, Karklins Dep., Ex. 25, at U00239.) Specifically, Professor Karklins asked: "What do you see as his most important contributions? How do they relate to the literature in his field? How would you assess the quality of the journals in which he is publishing?" (*Id.*)

The first external reviewer described Professor Lopez's scholarly record "as a record of *significant promise* rather than a record of completed achievement." (R. 52-1, Def.'s Combined Materials Vol. II, Ragsdale Decl., Tab 14, Ex. F at U00241) (emphasis in original). The reviewer concluded that much of Professor Lopez's argument in his book was speculative because a regime transition had yet to occur in Cuba; however, the reviewer concluded that the speculation was reasoned. (*Id.* at U00242.) Next, the reviewer commented that Professor Lopez's work fit well within critiques of the democratic transition literature that argues pressure from below rather than elite-division from above as the engine of transitions to democracy. (*Id.*) The reviewer observed that Professor Lopez's jointly authored book was largely a rough draft and that he did not read the work in any depth. (*Id.*) He noted that the authors, including Professor Lopez, challenge much of the established wisdom within the field. (*Id.* at U00243.)

The next reviewer commented on Professor Lopez's journal article concerning political economy issues in Argentina, concluding: "This is a valuable piece, generally well-situated in terms of the comparative literature and making its own contribution based on field research and other date [sic] in Argentina." (*Id.* at U00245.) The reviewer explained that Professor Lopez's book on Cuba combined careful scholarship "and political advocacy sometimes combined with harsh criticism." (*Id.* at U00246.) The reviewer concluded that "Professor Lopez is a serious scholar, whose work engages important issues. He has clearly read widely and is thus able to

8

bring relevant comparative literatures to bear on these issues. In doing so, he generates interesting and sometimes controversial findings which other scholars can then debate." (*Id.* at U00247) (parenthetical omitted).

The third reviewer observed that Professor Lopez makes an outstanding contribution to the area of transitions to democracy as exemplified in his book manuscript on Cuba. (*Id.* at U00250.) The reviewer describes the co-authored work as being "an important contribution to the description and understanding of postcommunist transition in different parts of the world" and that the "book will allow a broader and original comparative analysis." (*Id.*)

The next reviewer opined that Professor Lopez's journal article on political economy issues in Argentina was interesting, well reasoned, and well grounded in literature and concluded that "Prof. Lopez has the potential to make a significant contribution to literature on the political economy of neoliberalism ... but he has taken a detour into the question of Cuba's transition." (*Id.* at U00253.) As to Professor Lopez's work on Cuba, the reviewer stated: "Much of the scholarship on Cuba is highly polemical and not very scholarly. Prof. Lopez generally manages to avoid these pitfalls by presenting an objective, more rigorous analysis, even though he is clearly in favor of the U.S. embargo of the island." (*Id.* at U00254.) The reviewer concluded that Professor Lopez's analysis was highly informative, but not fully persuasive. (*Id.*)

The final reviewer commented that "Lopez is very talented in posing important questions, ones that both academics and non-academics interested in politics care about." (*Id.* at U00256.) He concluded that Professor Lopez was a good writer and a self-conscious methodologist. (*Id.*) Specifically, the reviewer concluded that Professor Lopez's work on Argentina's political economy was careful and measured. (*Id.* at U00258.) The reviewer then turned to the Cuba

9

manuscript: "I don't think the shift from Argentine political economy to Cuban transition studies was a good career move for Professor Lopez. It seems that his personal political commitments get him into trouble when his object of study is Cuba. He cares so much about getting to certain conclusions that he makes assertions that are not well founded by his data and, at worst, gives misleading accounts of the implications of comparative research for the Cuban case." (*Id.* at U00256-257.) The reviewer concluded that "Lopez's work on Cuba is neither good social science nor adept political analysis." (*Id.* at U00257.)

### 4.     Working Committee Report

Shortly before Professor Lopez's final tenure review, a working committee of faculty in the Political Science Department and LALS Program reviewed Professor Lopez's progress toward achieving tenure, which included a summary of the external reviews. (Def.'s Stmt. ¶ 50; Def.'s Tab 10, Karklins Dep., Ex. 8 at U00185-194.) The joint committee consisted of Professors Karklins, Koh, another Political Science faculty member, Professor Doris Graper, and the LALS Director, Frances Aparicio. (*Id.* at ¶ 50.) The committee concluded that Professor Lopez "has published steadily, albeit somewhat slowly, and that his forthcoming book as well as co-authored work promise to be well received by the profession." (Def.'s Tab 10, Karklins Dep., Ex. 8 at U00190.) The committee noted that Professor Lopez's service record consisted of him serving on a large number of departmental and university committees in both Political Science and Latin American Studies. (Def.'s Tab 10, Karklins Dep., Ex. 8 at U00191.) Also, the committee gave Professor Lopez an outstanding review for his teaching abilities. (*Id.* at U00193-194.)

10

## 5.     LALS Director's Memorandum

On October 4, 2001, Professor Aparicio, the Director of the LALS Program, wrote a memorandum to Dean Stanley Fish, Dean of the College of Arts and Science, and the Chair of the Political Science Department, Lyn Ragsdale, among others. (Def.'s Tab 1, Aparicio Dep., Ex. 9 at U00195.) Professor Aparicio first noted that the senior LALS faculty voted unanimously (3-0) in favor of promoting Professor Lopez with tenure. (*Id.*) Aparicio then commented that Professor Lopez's Cuba "work is highly controversial given his own personal engagement in anti-Castro policy within the United States." (*Id.*) She further articulated that his research was too biased and offered limited data that is highly suspect, but concluded that Professor Lopez's work, including his research on the political economy of Argentina, had "fulfilled the institutional expectations for promotion in terms of quantity and research productivity." (*Id.* at U00195-196.) The LALS Department deferred further evaluation of Professor Lopez's research to the Political Science Department. (*Id.* at U00196.)

In addition, Professor Aparicio opined that Professor Lopez was a good teacher with positive evaluations. (*Id.*) She noted, however, that in the previous two years, Professor Lopez did not participate in all of the programming and departmental functions at LALS, and concluded "his lack of even minimal participation in our program leads me to suggest that this may be a timely opportunity for him and for us to reconsider the percentage of his appointments and to discuss his unit allocations." (*Id.*) The LALS Department deferred any further evaluation and determination in terms of Professor Lopez's methodology, teaching contributions, and service to the Political Science Department. (*Id.*)

### 6. Political Science Department's Recommendation

On October 8, 2001, fourteen faculty members serving on the Promotion and Tenure Committee of the Political Science Department reviewed and considered Professor Lopez's tenure packet, which included LALS Director Aparicio's memorandum, the ad hoc working committee report, and the five external reviews. (Def.'s Stmt. ¶ 84.) The Political Science Department recommended against granting Professor Lopez tenure by a vote of 8 to 6. (Pl.'s Stmt. ¶ 32.) Department Chair Ragsdale attended the meeting, but did not vote. (Def.'s Stmt. ¶ 87.) The votes of the LALS Department and the Political Science Department's Promotion and Tenure Committee were advisory to Department Chair Ragsdale, who was the final decision maker on behalf of the Political Science Department. (*Id.* at ¶ 88.)

### 7. Department Chair Ragsdale's Recommendation

After considering Professor Lopez's tenure packet, the external reviews, and the content of Professor Lopez's book on Cuba, Professor Ragsdale notified Professor Lopez that she recommended against granting him tenure. (*Id.* at ¶ 89.) In her written justification for her recommendation, Professor Ragsdale stated: "My summary evaluation is that the quality and quantity of Professor Lopez's research accomplishments are inadequate to support tenure and promotion." (Def.'s Combined Materials Vol. II, Ragsdale Decl., Tab 14, Ex. F at U00197.) Professor Ragsdale concluded that although Professor Lopez had strong teaching and service records, these "achievements are not sufficient to overcome the problematic research record." (*Id.*) Professor Ragsdale further stated: "If one were to simply judge the visibility of the press alone, then Professor Lopez's book would certainly be considered a strong contribution. However, several of the external reviewers raise serious question [sic] about the content of the

12

book. My own reading of the manuscript is similarly pessimistic about its contribution to the study of transitions to democracy or their absence." (*Id.* at U00198.)

### 8.    Executive Committee of the College of Arts and Sciences

Prior to the meeting of the Executive Committee of the College of Liberal Arts and Sciences, Dean Fish met with LALS Director Aparicio to inquire about the disparity between the LALS and Political Science Departments' faculty votes. (Def.'s Stmt. ¶ 103.) Professor Aparicio told Dean Fish that the LALS vote and her recommendation anticipated a favorable vote and recommendation by the Political Science Department. Also, Professor Aparicio explained that because most of Professor Lopez's work was in the Political Science Department, LALS thought it was a timely opportunity to discuss Professor Lopez's allocation between the two departments. (Pl.'s Rule 56.1 Resp. ¶ 104; Def.'s Combined Materials Vol. I, Tab 1, Aparicio Dep. at 90-91,101-02.)

At the meeting of the Executive Committee of the College of Liberal Arts and Sciences, one committee member speculated whether Professor Lopez's anti-Castro views could have been a reason the Political Science Department voted against tenure. (Def.'s Stmt. ¶ 105.) The parties dispute Professor Ragsdale's response, although she testified in her deposition that the question regarding Professor Lopez's political perspectives posed at the Executive Committee Meeting related to whether Professor Lopez's political views influenced his social science research. (R. 56-1, Pl.'s Combined Materials Vol. II, Tab 15, Ragsdale Dep. at 89-90.) Participants at the meeting also discussed the comments and critiques of the external reviewers. (Def.'s Stmt. ¶ 106.) The Executive Committee voted 9 to 0 against granting tenure to Professor Lopez. (Def.'s Stmt. ¶ 108.)

### 9. Dean Fish's Recommendation

On December 7, 2001, Dean Fish prepared a justification for recommendation that was forwarded to Defendant Charlotte Tate, the acting University Provost, and Defendant Clark Hulse, the Dean of UIC's Graduate College. (*Id.* at ¶ 111.) In this written justification, Dean Fish explained Professor Lopez's tenure process, highlighting the external reviews of Professor Lopez's Cuban scholarship. (Def.'s Combined Materials Vol. II, Ragsdale Decl., Tab 14, Ex. F at U00202-204.) Dean Fish articulated:

> Members of the Executive Committee raised various questions about this case, in particular the extent to which the third-year review provided adequate feedback to Lopez about where he ought to be placing his priorities. Their unanimous vote against the case seems to refelct, [sic] in general, a sense that procedurally the Department has moved with appropriate care and that in substance, after all that has been and needs to be said in defense of the candidate and his contributions to teaching and service, the quality of the work does not rise to the level we expect for the award of promotion and tenure. With regret, I concur in their finding.

(*Id.* at U00204.) Dean Fish had read the five external reviews, as well as a majority of Professor Lopez's book, prior to making this recommendation. (Def.'s Stmt. ¶ 112; Pl.'s Resp. ¶ 112.)

### 10. Campus Promotion and Tenure Committee Recommendation

In March of 2002, the Campus Promotion and Tenure Committee considered Professor Lopez's tenure application, after reviewing his tenure packet, external reviews, and the recommendations of the Political Science Department, Chair Ragsdale, the Executive Committee, and Dean Fish. (Def.'s Stmt. ¶ 113.) After considering the above, the Chair of the Campus Promotion and Tenure Committee, Russell R. Betts, on behalf of the entire committee, wrote its advice to the Vice Chancellor for Academic Affairs, Sylvia Manning. (Def.'s Combined Materials Vol. II, Ragsdale Decl., Tab 14, Ex. F at U00205.) Chair Betts explained

14

that the case boiled down to the quality of Professor Lopez's research on Cuba. (*Id.*) Chair Betts further explained: "A majority of the committee members were persuaded by views expressed by the Head of Political Science and various outside reviewers. Namely, that the book suffers from serious deficiencies of scholarship and that the author may have let his political sympathies interfere with his scholarship." (*Id.*)

### 11. Professor Lopez's Appeal to the Chancellor

On April 21, 2002, Professor Lopez appealed the negative decision on his tenure bid to Chancellor Manning. (Def.'s Stmt. ¶ 124.) He argued that the quality of his book was very good and that he had met all tenure requirements. (*Id.*) Professor Lopez contended that "[i]t is quite possible that I am being discriminated [sic] for my political views and for my nationality." (Def.'s Combined Materials Vol. II, Ragsdale Decl., Tab 14, Ex. F at U00282.) On May 6, 2002, Chancellor Manning wrote Professor Lopez that she had reviewed his request for reconsideration of the negative recommendation on his application for tenure and would not recommend his bid for promotion to the Board of Trustees. (*Id.* at U00284.)

## III. ANALYSIS

### A. National Origin Claim

Professor Lopez argues that he was denied tenure based on his national origin. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Because Professor Lopez does not present any direct evidence of national origin

15

discrimination, the Court addresses his claim under the indirect burden-shifting method of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* burden-shifting method, a plaintiff must first establish a prima facie case of discrimination. To make a prima facie case of discrimination in tenure, the plaintiff must show that (1) he is a member of a protected class, (2) he was qualified for tenure, (3) he was denied tenure, and (4) an applicant outside of his protected group was granted tenure. *Namenwirth v. Board of Regents of Univ. of Wisconsin,* 769 F.2d 1235, 1240 (7th Cir. 1985).

Once the employee makes a prima facie showing of discrimination, the employer must produce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the employer sets forth a legitimate justification for its action, the burden then shifts back to the plaintiff to prove that the employer's reason is a pretext for discrimination. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255-56, 101 S.Ct. 1089, 67 L.Ed. 2d 207 (1981). The ultimate burden of persuasion remains at all times with the plaintiff. *See St. Mary's Honor Ctr.,* 509 U.S. at 507.

The Court need not decide whether Professor Lopez has established a prima facie case of national origin discrimination because he has failed in his burden of establishing that UIC's proffered reason for him denying him tenure – his scholarship was insufficient to merit tenure – was pretext for discriminating against him because he is Cuban. *See Lesch v. Crown Cork & Seal Co.,* 282 F.3d 467, 473 (7th Cir. 2002) ("It is not always necessary to march through this entire process if a single issue proves to be dispositive."). To demonstrate pretext, Professor Lopez must show that UIC's reason for denying him tenure: (1) had no basis in fact; (2) did not

actually motivate the adverse employment action; or (3) was insufficient to motivate the adverse action. *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004). The focus of the Court's pretext inquiry is whether the University's stated reason was honest, not whether it was accurate, wise, or well-considered. *See id.* (quotation and citation omitted); *see also Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1015 (7th Cir. 2000)(question is whether employer honestly believed reason at time of adverse employment action).

Professor Lopez challenges the University's proffered reason arguing that there is substantial evidence in the record that his book on Cuba was excellent in scholarship, including the fact that John Hopkins University Press chose to publish it, and therefore, UIC's professed belief to the contrary cannot be honest or true. The pertinent inquiry, however, is whether UIC's reason for denying tenure had any basis in fact, not whether some facts support Professor Lopez's argument. *See Olsen v. Marshall & Isley Corp.*, 267 F.3d 597, 601 (7th Cir. 2001) (if employee presents evidence showing employer's explanation has no factual basis, factfinder may infer that employer is lying about the true motive). Accordingly, the Court looks to whether UIC's proffered reason – Professor Lopez's research was insufficient to merit tenure – has any factual basis.

Here, the record contains evidence from different individuals and committees supporting the University's decision. The criticisms of Professor Lopez's scholarship come from more than just the University. The factual basis for the University's decision includes reviews of Professor Lopez's Cuba research by external reviewers. For instance, one external reviewer commented: "Much of the scholarship on Cuba is highly polemical and not very scholarly." Another external reviewer concluded that "Lopez's work on Cuba is neither good social science nor adept political

17

analysis." In addition, decision makers within the University concluded that the quality of Professor Lopez's scholarship was insufficient to warrant tenure. After reading substantial portions of Professor Lopez's book manuscript and considering the external reviewers' reports, both Professor Ragsdale and Dean Fish had concerns over the quality of his research and analysis. Also, the various University committees reviewing Professor Lopez's tenure application, including committees outside of the Political Science Department, concurred with the assessments that Professor Lopez's scholarship did not merit tenure.[2]

Professor Lopez also argues that the record suggests that a discriminatory motive was the real reason that the University denied him tenure. Professor Lopez bases his argument on the fact that one of his external reviewers apparently disagreed with his political views on Cuba and the resulting bias was "palpable." Professor Lopez's argument focuses on his political views of Cuba, not the fact that he is Cuban or a Cuban exile. Title VII does not protect a person's political beliefs. *See* 42 U.S.C. § 2000e-2(a)(1). Accordingly, Professor Lopez's argument that there is a general bias in American academia against anti-Castro, pro-Embargo views cannot support his claim that the University discriminated against him based on his national origin.

Finally, Professor Lopez contends that there is relevant comparative evidence that establishes pretext for discrimination. *See Namenwirth,* 769 F.2d at 1240. Professor Lopez argues that UIC granted tenure to a non-Hispanic associate professor in the Political Science

---

[2] Citing a Northern District of Illinois case, Professor Lopez argues that in determining whether UIC's proffered reason for the denial of tenure was pretext, the Court should not give any deference to UIC's academic judgment concerning his scholarship. *See Schneider v. Northwestern Univ.,* 925 F.Supp. 1347, 1369 (N.D. Ill. 1996). The holding in *Schneider* does not support Professor Lopez's contention. Instead, the court held: "The court's concern is whether the institution, when it made its decision to deny tenure, believed the reasons given." *Id.* In any event, the decision in *Schneider* is persuasive rather than controlling authority.

Department who had less meritorious scholarship than he and that this evidence establishes that the University's reasons for denying him tenure were untrue. Specifically, Professor Lopez offers evidence of an associate professor whom the University granted tenure the following year, even though he had not published a book at the time they granted him tenure. Professor Lopez argues that although the associate professor had a contract with Duke University Press to publish a book, this was not as prestigious as his contract to publish with John Hopkins University Press. Professor Lopez, however, does not point to any evidence that the associate professor's scholarship was insufficient or did not warrant tenure.

Although the *Namenwirth* court upheld the use of comparative evidence to establish that a defendant's proffered motive may be unworthy of belief, the court cautioned against a *de novo* review of tenure decisions. *Id.* at 1242-43. Here, although there is evidence that another associate professor did receive tenure without having published a book, there is substantial evidence in the record justifying the votes against granting Professor Lopez tenure, namely, the quality of his scholarship. As the *Namenwirth* court explained: "Tenure decisions have always relied primarily on judgments about academic potential, and there is no algorithm for producing those judgments." *Id.* at 1243. Based on the evidence offered by Professor Lopez, the Court declines to re-examine the University's assessment of his scholarship or make credibility determinations as he suggests. *See Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004) (courts do not act as "super-personnel department" when reviewing employer's decisions).

In sum, it is not the Court's role to determine whether UIC's proffered reason for denying Professor Lopez tenure was accurate, wise, or well-considered. *See Davis,* 368 F.3d at 784; *see also Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004) ("This circuit adheres

to the honest-belief rule: even if the business decision was ill-considered or unreasonable, provided that the decisionmaker honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist."). The Court concludes that the University has produced evidence of a legitimate, non-discriminatory reason for denying Professor Lopez his request for tenure. Professor Lopez, on the other hand, has not provided evidence that the University did not believe its employment decision was true at the time it denied him tenure. As such, Professor Lopez has failed in his burden in establishing that the University's reason was merely pretext for discriminating against him because he is Cuban. Therefore, Professor Lopez's Title VII claim fails.

### B.    First Amendment Claim

Next, Professor Lopez contends that the individual defendants denied him tenure in retaliation for exercising his right of freedom of expression under the First Amendment. The First Amendment protects the freedom of speech and expressive conduct and generally prevents the government from proscribing such activities. *R.A.V. v. City of St. Paul, Minnesota.,* 505 U.S. 377, 382, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). To state a claim for retaliation based on the First Amendment, Professor Lopez must establish that (1) his speech was constitutionally protected, and (2) his constitutionally protected speech motivated the individual defendants' actions. *Vukadinovich v. Board of Sch. Trs. of N. Newton,* 278 F.3d 693, 699 (7th Cir. 2002). If Professor Lopez establishes these first two prongs, the burden shifts to the individual defendants to prove that they would have denied Professor Lopez's tenure regardless of the protected speech. *Id.* If the individual defendants carry that burden, Professor Lopez bears the burden of persuasion to demonstrate that the proffered reasons were pretextual and that discrimination was

the real reason Defendants denied his tenure. *Id.* In the context of summary judgment, this means that Professor Lopez must show that a rational factfinder could infer that the individual defendants' proffered reasons were lies. *Id.*

The individual defendants do not dispute that Professor Lopez's expression of his political views on Cuba constitutes constitutionally protected speech. Assuming, *arguendo,* that Professor Lopez can show that the individual defendants' actions were motivated by his protected speech, the Court nevertheless concludes that Professor Lopez cannot establish that the individual defendants' justification for denying his tenure was pretext. *See id.* As previously discussed, the individual defendants' proffered reason for denying Professor Lopez's tenure was because his scholarship was insufficient to merit tenure. As is true under Title VII, to reach a jury with a theory of First Amendment retaliation, Professor Lopez must establish that a reasonable jury could conclude that the individual defendants' legitimate reason for the denial of his tenure was a lie. *See Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1016 (7th Cir. 2004).

Under this requirement, Professor Lopez can show pretext with direct evidence establishing that retaliation was the most likely motive, or indirectly, by showing that the individual defendants' proffered reasons are not worthy of credence. *See Vukadinovich,* 278 F.3d at 700-01. Although Professor Lopez acknowledges that it is his burden to prove that Defendants' proffered reason is pretext for discrimination, Professor Lopez does not directly address Defendants' reason that his scholarship was insufficient. Instead, he argues that his tenure review was biased and that Defendants disregarded favorable evaluations of his book. He also argues that Defendants effectively disregarded the fact that one of the most prestigious

21

publishers of academic work in the United States published his book.

When viewing these facts in a light most favorable to Professor Lopez and drawing all reasonable inferences in his favor, these arguments are insufficient to establish that retaliation was the individual defendants' most likely motive in denying Professor Lopez's tenure or that Defendants' proffered reason is untrue. In other words, these arguments do not establish that a rational factfinder could infer that the individual defendants' proffered reason was a lie. *Id.* at 699. Although the individual defendants have the burden of establishing the lack of any genuine issue of material fact, Professor Lopez still must present definite, competent evidence to rebut the summary judgment motion. Here, Professor Lopez has failed to rebut Defendants' proffered reason that he was denied tenure based on the quality of his scholarship.

As Professor Lopez points out, there is evidence in the record that some of the reviewers questioned whether Professor Lopez's political beliefs influenced his research and scholarship. These observations, however, do not refute Defendants' reason that Professor Lopez's scholarship was insufficient. Professor Lopez's belief that these comments and his perceptions that the Political Science Department was pro-Castro, anti-Embargo are his own subjective beliefs, which alone cannot establish pretext. *See id.* at 700. Therefore, the Court grants the individual defendants' motion for summary judgment as to Professor Lopez's First Amendment retaliation claim.

## C. Due Process Claim

Based on the rule-governed process of the University's Promotion and Tenure Policies and Procedures, Professor Lopez contends that he had a property interest in his position as a non-tenured faculty member at UIC and that Defendants denied him due process when the individual

22

defendants conducted an unfair tenure review process.

Procedural due process claims require a two-step analysis. *Pugel v. Board of Trs. of the Univ. of Illinois*, 378 F.3d 659, 662 (7th Cir. 2004). A court first examines whether the plaintiff has been deprived of a protected property interest and then determines what process is due. *Id.* Depending on the terms or conditions of his employment, a public employee may have a property interest in his employment requiring the due process guarantees of the Fourteenth Amendment. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). A property interest is established "by existing rules or understandings that stem from an independent source such as state law – rules and understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* Based on such existing rules or understandings, a protected property interest exists when the employer's discretion in denying continued employment is limited unless specific conditions are met. *Colburn v. Indiana Univ.*, 973 F.2d 581, 589-90 (7th Cir. 1992). In other words, an employee has a protected property interest if there is a mutually explicit understanding of his continued or indefinite employment. *See Omosegbon v. Wells*, 335 F.3d 668, 674 (7th Cir. 2003).

In *Colburn*, the Seventh Circuit considered whether probationary employees on the Indiana University faculty had property interests in their employment based on general statements made in handbooks and appointment documents. *Colburn*, 973 F.2d at 589. The Seventh Circuit concluded that because there were no limits to the University's decision making relating to the plaintiffs' continued employment, the plaintiffs did not have a property interest in their employment. *Id.* at 590. The *Colburn* court explained: "It is not surprising that courts have regularly refused to find that a probationary faculty member has a property interest in receiving

tenure since implying an absolute right to tenure would be inconsistent with the existence of a formalized tenure process." *Id.*; *see also Board of Regents v. Roth*, 408 U.S. at 578 (assistant professor serving series of annual appointments without entitlement to renewal had no property interest).

Here, it is undisputed that non-tenured faculty members at UIC are probationary employees with year-to-year contracts. Based on this policy, UIC is not limited in denying Professor Lopez's continued employment. There is no mutually explicit understanding of his continued employment with the University. Because Professor Lopez has not established that he has a protected property interest, the Court need not determine what process UIC should have afforded him. *See Pugel*, 378 F.3d at 662.[3]

## IV.   CONCLUSION

For these reasons, the Court grants Defendants's motion for summary judgment.

Dated: November 12, 2004

ENTERED

AMY J. ST. EVE
United States District Court Judge

---

[3] Because the Court concludes that the facts do not establish a First Amendment violation and that Professor Lopez cannot bring a due process claim, the Court need not consider the individual defendants' qualified immunity defense. *See Sullivan v. Ramirez*, 360 F.3d 692, 703 (7th Cir. 2004).